FILED
2022 Jan-04  PM 12:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **GRAMATA SHORTER and CHAD SLADE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No.:** |
| **vs.** | ) | |
| | ) | **JURY DEMAND** |
| **TRUIST FINANCIAL CORPORATION, and BRENT BOOYSEN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW the Plaintiffs in the above-styled case, Gramata (Nikki) Shorter and Chad Slade, by and through her undersigned attorney, Richard R. Newton, and file this action against Defendants Truist Financial Corporation and Brent Booysen.

## INTRODUCTION

(a) This is a Title VII disparate treatment and retaliation case arising out of Gramata Shorter's (Shorter) claim that her former employer, Truist Financial Corporation (Truist), violated Title VII of the Civil Rights Act of 1964, as amended, (42 U.S.C. §2000e, *et seq*) when it subjected Shorter to adverse employment action(s) in which Shorter's race and/or sex were motivating factors, or, but for Shorter's race (Black) and sex (female), Truist would not have perpetrated against Shorter.

(b) This is also a race discrimination case in employment / contract Shorter brings

against Truist under 42 U.S.C. § 1981 in which Shorter claims that but for her race (Black) Truist would not have discriminated against Shorter in certain terms and conditions of her employment.

(c) Shorter also claims workplace Retaliation, prohibited by and under Title VII (42 U.S.C. §2000e-3), when Truist took a materially adverse action against Shorter, firing her, her for participating in a Protected Activity (opposing workplace race and sex discrimination).

(d) Additionally, Shorter makes Intentional Infliction of Emotional Distress claims against both Truist and its agent, Defendant Brent Booysen (Booysen).

(e) Plaintiff Chad Slade (Slade) alleges that Truist violated 42 U.S.C. § 1981 when it closed his Truist checking account which, but for his race, Black, Truist would not have done.

(f)  Both Shorter and Slade claim various damages proximately caused by Truist's and its agent's, Booysen's, acts and omissions, as set forth herein.

## JURISDICTION AND VENUE

1.  Plaintiffs Gramata Shorter (Shorter) and Chad Slade (Slade) bring this action under Federal Question Jurisdiction, 28 U.S.C. §1331, arising out of Truist Bank (Truist) violating Title VII of the Civil Rights Act of 1964, as amended [Title VII], (42 U.S.C. §2000e *et seq*) and 42 U.S.C. § 1981.

2.   Plaintiff Shorter also brings this action against Defendants under this Court's Supplemental Jurisdiction, 28 U.S.C. 1367, over her Alabama State Law Claims, which are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy.

3.    Venue is proper under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims occurred in the United States District Court for the Northern District of Alabama. Plaintiff Shorter's Truist workplace (when not home-officing due to Covid-19) was in Birmingham, Jefferson County, Alabama, in the Southern Division of the Northern District of Alabama. Plaintiffs reside in St. Clair County, Alabama. Truist's principle place of business is situated in Charlotte, Mecklenburg County, North Carolina. Booysen resides in Greensboro/Winston-Salem, Forsyth County, North Carolina.

4.    Plaintiff Shorter filed her Equal Employment Opportunity Commission (EEOC) Charge of Discrimination with the Birmingham, Alabama, District Office on or about January 11, 2021. Upon Plaintiff's request, on October 18, 2021, the EEOC issued a Notice of Right to Sue (NRTS). A copy of Plaintiff's NRTS is attached hereto.

5.   Plaintiff files this action within 90 days of her receipt of the EEOC's NRTS, as required under Title VII.

**PARTIES**

6.  Plaintiff Shorter is an adult over the age of nineteen (19) years of age who resides in Moody, St. Clair County, Alabama.

7.  Plaintiff Slade is an adult over the age of nineteen (19) years of age who resides in Leeds, St. Clair County, Alabama.

8.  Defendant Truist is a North Carolina-based company, which does business in the Southern Division of the Northern District of Alabama Truist's principle place of business is located in Charlotte, North Carolina.

9.  Defendant Booysen is an adult over the age of nineteen (19) years of age who resides in Greensboro/Winston-Salem, North Carolina.

**STATEMENT OF FACTS**

7.  Truist Financial Corporation (Truist) is a bank holding company.

8.  Truist employs more than 50,000 people.

9.  Truist is successor in interest to BB&T Bank, which originally hired Plaintiff Shorter in or around October 2018 to work for its subsidiary, CRC Group, then a wholesale insurance subsidiary of BB&T.

10. In late 2019 Defendant Truist Financial Corporation was created through the merger of BB&T and SunTrust Bank.

11. As of 2020, Truist's subsidiary, Truist Insurance Holdings operated a portfolio

of several businesses, including CRC Group.

12.  During all times relevant to this action, in 2020 Shorter's employer was part of Truist Insurance Holdings, which is was and is owned and operated by Defendant Truist.

13.  Through its CRC Group subsidiary, Defendant Truist employed Plaintiff as "Regional Insurance Account II / Accounts Receivables."

14.  Shorter's CRC/BB&T/Truist office, her workplace, was located in Birmingham, Jefferson County, Alabama.

15.  By the later part of 2020, and owing to Covid-19 precautions, Shorter was home officing for her employer, but both her main CRC Group and BB&T main offices remained in Birmingham.

16.  At all times relevant to this action, Defendant Booysen was employed by Truist as a "Senior Investigator."

17.  In a November 24, 2020, email from Booysen to Shorter, Booysen – referring to Shorter – proclaims "your employment at TRUIST."

**Shorter's and Slade's Joint Checking Account with Truis*t***

18.  Gramata Shorter is Chad Slade's mother.

19.  Plaintiffs are Black.

20. Shorter is a woman.

5

21. In or around the first quarter of 2019, Shorter and Slade opened a joint checking account at BB&T – later that year to become Truist.

22. At all times relevant to this action, Slade was employed as an offensive lineman by the NFL's New York Giants football team.

23. Plaintiffs opened their joint checking account in order to easily facilitate Slade's depositing funds in an account which is mother could from time-to-time draw upon, write checks on, both to assist Slade in handling his finances as well as to draw upon for Shorter's and her husband's, Slade's stepfather's, occasional needs.

24. In or around the first week of August 2020, after talking with Slade, Shorter wrote two (2) checks on their joint account for "Cash" – one check for about $8,500.00 and the other for about $500. In one or both memo lines Shorter referenced her husband's, Slade's stepfather's, business, as Shorter and Slade chose to assist Shorter's husband, Slade's stepfather's, business.

25. Plaintiffs' joint checking account had more-than-enough funds to cover the two (2) early August checks.

26. In the months preceding and in the months following early August 2020, credits to and debits from Shorter and Slade's joint account exceeded $8,500.00; in the context of Plaintiffs' overall joint account activity since early 2019, an $8,500.00 draw on their account was in no way, shape or form unusual or out of the ordinary.

27.  Before late 2020, neither BB&T (nor later Truist) ever contacted Shorter or Slade regarding "suspicious" account activity or a check or other credit or debit that was "flagged" as unusual.

28. In the banking industry it is a typical practice to daily monitor account activity – by individual tellers, automated/electronically, etc. That is, During the course of day-to-day operations, employees may observe unusual or potentially suspicious transaction activity, or automated systems can identify unusual account activity.

30.  Typically, unusual bank account activity which can trigger an investigation occurs within days of out-of-the-ordinary (for a particular account) activity.

31.  Many, if not most, persons with checking, debit or credit card accounts at U.S. banks have from time-to-time received a telephone call from their financial institution asking whether a particular transaction was authorized. This typically occurs within hours of, rarely more than a few days from, the suspicious, out-of-the-ordinary, transaction.

**November 19, 2020: Booysen Begins Harassing Gramata Shorter**

32.  On the morning of November 19, 2020, Plaintiff Shorter received a telephone call from a man who identified himself as Brent Booysen.

33.  Booysen is White and is a Truist Vice President.

34.  Booysen said another man was listening in, but Shorter did not catch the

name and the other man never spoke.

35.  Shorter had no idea who Booysen was.

36.  Booysen began interrogating Shorter about her early August 2020 checks from her and Slade's joint checking account at Truist, the $8,500.00 check and the $500.00 check.

37. The checks Booysen interrogated Shorter about had been written and had cleared with no problem more than three (3) months earlier.

38.  Booysen did not dispute that the joint account in question had had sufficient funds to cover the checks Shorter had written.

39. Shorter asked, "What is this about?" or words to that effect. Booysen ignored her.

40.  Booysen plowed ahead and asked what the early August checks had been *for*. Shorter said they were for her husband's business.

41.  Booysen demanded Shorter tell him whether she employed by her husband's business. She answered she was not.

42.  Booysen wanted to know if Shorter kept cash "lying around the house," or words to that effect. Shorter answered that she didn't.

43.  Shorter recalls asking, or inviting, Booysen to check with her son, Chad Slade, about the two checks. Booysen said he wasn't interested.

44. In fact, neither Booysen, nor anyone with Truist, ever contacted Slade about the supposedly "suspicious" checks or "unusual" account activity.

45. If Booysen had a good faith interest in investigating "suspicious" account activity, he would have contacted the joint account holder, Slade, about his "suspicions."

46. In fact, what was suspicious, what was unusual, what was untoward, was Booysen – with Truist's blessing – contacting Shorter out of the blue more than three (3) months after the checks in question were written and cleared, and interrogating Shorter about her employment (she was employed by Truist), whether she "kept cash around the house," and never telling her what the problem or issue was.

47. Booysen tone and questioning were harassing, intimidating, humiliating, and entirely out of bounds. But Shorter answered all his questions, owing to Booysen's bullying, threatening, insistent tone.

48. Once it was established (which, as far back as August 2020) that the two (2) checks in question (a), were not out-of-the-ordinary activity for Shorter's and Slade's joint account; (b), that the account had sufficient funds to cover the checks; and, (c), that Shorter had, in fact, written and authorized the checks, that should have ended Truist's inquiry and Booysen's interrogation of Shorter, but it didn't.

49. Booysen's questions were out of bounds, and invaded Shorter's and her family's privacy.

50.  Booysen's call, his interrogation of Shorter, lasted more than half-an-hour.

51.  Booysen immediately sent Shorter a follow-up email and told her to email back, and put her answers in writing. To Shorter, it felt like it was starting all over again.

52.  By the time Booysen hung up, Shorter was an emotional and physical wreck. She had answered all of Booysen's questions, but he would not let up; he never told Shorter what she had done wrong or what he even suspected she had done wrong. Booysen's acts and omissions were purposefully cruel, a long-distance gaslighting and intrusion into the Shorter's home and Ms. Shorter's personal solicitude.

53.  Shorter was near collapse and called her husband in tears.

54.  Shorter then called a family attorney, who dashed off an email to Booysen, to which neither Booysen nor any Truist employee responded – On November 24, 2020, Booysen emailed *Shorter* again and told her, in sum, that she had no right to an attorney being involved in Truist's interrogation of her, that he, Booysen, would not respond to an attorney, and that she was violating Truist's ethics rules, which, in fact, she had not violated and was not violating.

55. Later on November 19, not long after talking with her husband and her family lawyer, Shorter called her CRC/Truist supervisor, Marci Shaffer, and told her what had happened.

56. To Shorter, Shaffer sounded puzzled, saying that she had no idea what such a call (from Booysen) could be about and that the whole thing sounded odd to her.

57. Shaffer could tell that Shorter was distraught. Shaffer told Shorter to take the rest of the day off and "take care of yourself," or words to that effect. Shaffer sounded worried about Shorter's emotional health.

58. In or around 2012, Shorter was diagnosed with Multiple Sclerosis (MS).

59. According to The Mayo Clinic, "MS is a potentially disabling disease of the brain and spinal cord (central nervous system). In MS, the immune system attacks the protective sheath (myelin) that covers nerve fibers and causes communication problems between your brain and the rest of [one's] body. Eventually, the disease can cause permanent damage or deterioration of the nerves."

60. Multiple Sclerosis can be a scary disease to contend with. For Shorter, MS is a scary disease to contend with, but with treatment, she survives and to the extent she can, thrives.

61. Within hours following Booysen's harassing, intimidating, privacy-invading call to and interrogation of Shorter, she felt her right side going numb. This was an MS "flare up," proximately caused by Booysen's actions, which physically and emotionally drained, Shorter, causing her intense distress, anxiety, mental anguish, and physical exhaustion, all leading to the MS flare-up.

62.   Shorter telephoned her doctor's office, spoke to an assistant, and later the same day the assistant called to confirm the doctor had phoned-in a prescription for her.

**Shorter Participates in Protected Activities**

63.   The following day, November 20, 2020, Shorter still wondered and worried that Booysen may have been a scammer – given his belligerency, the fact that his "investigation" call came more than three (3) months following the joint checking account activity he acted so concerned about, his insistence that Shorter telling him <u>personal</u> information ("*do you keep cash in your house?*") far outside the bounds of any legitimate inquiry into her account activity, and, not insignificantly, Booysen's disinterest in talking with the other joint account-holder, Slade.

64. In a follow-up telephone call with her supervisor, Ms. Shaffer, Shaffer told Shorter that she had looked into the matter and it appeared Booysen really was from Truist.

65. On November 24, 2020, Booysen emailed Shorter the message described in the foregoing Paragraph 54.

66.   Booysen refused to tell Shorter what law, rule, regulation, guideline, he suspected her of violating; he refused to provide any reason for his harassing Shorter, especially given that the checks he interrogated Shorter about cleared with no problem, were not unusual debits for her and Slade's overall joint checking account activity, had

been written and cleared more than three (3) months before Booysen's initial November 19, 2020, call, and given that Shorter had answered all of Booysen's invasive questions.

67. On December 1, 2020, Shorter emailed Booysen. Shorter's December 1, 2020, email was a follow-up to one sent by her family lawyer, which was ignored by Booysen and Truist.

68. In her December 1, 2020, email to Booysen, Shorter noted, *inter alia*:    (a) that she had "no clue what this was about; and, (b), "[Y]ou asked me what did I do with my personal money. You asked If I have the money laying around the house or something. I think that was a very threating [sic] and an invasive question."

69.  In her December 1, 2020, email to Booysen, Shorter noted that she was not only a Truist employee, but (as far as her joint checking account went) a Truist client / customer.

70. In her December 1, 2020, email to Booysen, Shorter noted that Booysen's emails were harassing.

71. In her December 1, 2020, email to Booysen, Shorter noted that on Page 7 of Truist's "Teammate Handbook" various admonishments are found, which apply to Booysen, as well as to other Truist employees, including:  "Treat everyone in a fair and honest manner," further noting that Booysen's lack of transparency and harassing emails

were neither fair nor honest, to Shorter as an employee, nor as a Truist checking account holder.

72. In her December 1, 2020, email to Booysen, Shorter noted that on Page 7 of Truist's "Teammate Handbook" various admonishments are found, which apply to Booysen, as well as to other Truist employees, including:  "The relationship between client and financial services provider is one of mutual trust and respect," further noting that Booysen had shown no respect to Shorter.

73. In her December 1, 2020, email to Booysen, Shorter noted that on Page 7 of Truist's "Teammate Handbook" various admonishments are found, which apply to Booysen, as well as to other Truist employees, including:  "Truist's Codes of Ethics also mentions "integrity" and "principled business conduct;" further noting that harassing emails and calls lacking transparency, to both a client and employee, demonstrated no integrity or principles.

74. Shorter closed her December 1, 2020, email to Booysen:   "Are you harassing me based on my race? Based on my sex? You provide no alternative reason/s."

75.  On or about the same day, December 1, 2020, Shorter called Truist's "Human Resources Hotline" and submitted a complaint about Booysen, including her concerns about race discrimination.

76. Truist's ignored Shorter's complaint about Booysen and race discrimination.

77. On December 17, 2020, sixteen (16) days following Shorter's email to Booysen in which she raised concerns about workplace race and sex discrimination, harassment, and about sixteen (16) days after complaining to Truist HR about Booysen, Truist fired Shorter.

78. Shorter's asking Truist Vice President Booysen if he was harassing her based on her race or sex, and noting that he had provided no alternative reasons for his doing so, was a protected activity under Title VII of the Civil Rights Act of 1964.

79. Truist's firing Shorter within sixteen (16) days of her participating in an activity protected under Title VII, simultaneously reporting Booysen to Truist HR (which HR ignored), was temporally proximate to Shorter's participating in a protected activity.

80. Truist's firing Shorter within sixteen (16) days of her participating in a protected activity was retaliation for Shorter asking Vice President Booysen if his harassing her was based on race or sex, noting that he gave no alternative reasons for doing so.

81. When Truist fired Shorter, it provided no reason for doing so. On or about December 17, 2020, Shorter asked her Supervisor, Marci Shaffer, why Truist had fired her. On December 18, 2020, Ms. Shaffer emailed Shorter, claiming that Shorter had violated Truist's "Code of Ethics" for failing to "cooperate with an investigation."

Shorter had, in fact, cooperated with Booysen's "investigation." Truist's reason for firing Shorter was mere pretext.

82. Booysen's aforementioned bullying and harassment of Shorter, his hectoring her in her home, his invasive and unreasonable interrogation, proximately caused Shorter to suffer mental anguish, anxiety, a frightening MS flare-up, humiliation and fear.

83. Truist's firing Shorter shortly after she complained to its HR hotline and emailed Booysen with her concerns about race and sex discrimination, only continued and exacerbated Shorter's aforementioned mental anguish.

84. Even recalling what Booysen and Truist put her through in 2020, continuing into 2021, proximately causes Shorter to suffer from stress, frustration and humiliation.

**More Truist Retaliation / Race Discrimination**

85. As with all Truist checking account holders, when Shorter and Slade opened their joint checking account with BB&T-cum-Truist, they effectively entered into a contract in which, in sum, held that for the consideration of fees paid and their allowing the bank the benefit of including their checking account funds in its overall assets (the more deposits, the better the bank's financial appearance), the bank would allow them to use of the checking account and its various conveniences.

86. As part of the agreement between Truist and Plaintiffs, it was understood and acknowledged that Truist had the right to close Plaintiff's joint checking account for a good reason, a bad reason, or no reason at all – as long as the reason was not a discriminatory one.

87.  Within days of Truist firing Shorter, it closed Shorter's and Slade's joint checking account.

88. Neither before nor contemporaneous with Truist closing Shorter's and Slade's joint checking account did Truist accuse either Plaintiff of wrongdoing, nor did any banking regulatory agency or law enforcement or taxing authority accuse Plaintiffs of any wrongdoing in connection with their joint checking account.

89.  As Shorter had, in fact, answered all of Booysen's questions, even the invasive, untoward, unreasonable questions, but had about three (3) weeks earlier questioned whether Booysen's harassment was race- or sex-based; and given that Slade is male, race and/or retaliation based on race remains only reason left for Truist's shutting-down and closing their joint checking account.

90. In other words, but for Plaintiffs' race, Black, Truist would not have closed their joint checking account.

91.  When Truist closed their joint checking account, Shorter and Slade not only suffered various, banking hassles, but also suffered humiliation, degradation and stress

which Truist proximately caused by its acts and omissions.

92. Both Truist's and Booysen's aforementioned acts and omissions were perpetrated intentionally and/or with reckless disregard.

93. Truist adopted and/or ratified Booysen's aforementioned acts and omissions.

**Truist's and Its CRC Group's Track Record**

94. In 2018, when BB&T hired Shorter to work in its CRC Group subsidiary, Shorter went through "self-training" via computer in which she watched various videos regarding BB&T operations, policies, and the like.

95. One of those videos dealt with workplace discrimination. It was less than an hour long. It was not live. There was no Human Resources official in the room with Shorter, no other new or long-time employees, no interaction. Just a video to watch.

96. When BB&T and SunTrust Bank merged to become Truist in late 2019, Shorter went through a similar drill regarding various operations, policies, videos. The scene described in the foregoing Paragraph 93 repeated itself in late 2019 or early 2020.

97. Such self-training videos are virtually worthless, indicating that employers – like BB&T, now Truist – that use them believe they need to "cover their backsides" regarding workplace discrimination, while simultaneously not actually *train* new or veteran employees regarding workplace discrimination, harassment, retaliation. The message such self-training videos send to employees is that the employer does not, in

fact, take workplace discrimination seriously.

98. Shorter had an exemplary work record, including from November 2020, and through December 17, 2020, when Truist fired her.

99. In late June 2020, one of Shorter's white co-workers emailed a CRC Group client and, in sum, ran-down, character-assassinated, Shorter. The white co-worker even called Shorter's interactions with the client "gross," when, in fact, Shorter always interacted professionally with clients.

100. Shorter had done nothing deserving such defamatory, inflammatory, demeaning accusations by a co-worker to a client regarding her.

101. Shorter brought the matter to her Supervisor, Ms. Shaffer, in writing.

102. Ms. Shaffer, then the local office's manager, Wendy Croomens, contacted Shorter and apologized to her, both telling Shorter that the co-worker had behaved poorly and that Shorter had done nothing wrong. Then the then-Chief Operating Officer for Truist's CRC Group telephoned Shorter and apologized to her for the co-worker's behavior.

103.   During each of the follow-up, apology, telephone calls – with Shaffer, Croomens and the COO (Shorter cannot recall his name) – Shorter asked whether there was a racial thing involved.

104. In June 2020, in the wake of George Floyd's murder, racial tensions were

particularly high in the United States. Both civil justice advocates and racists were expressing their respective views across the country.

105. When Shorter asked her Supervisor, Manager and COO about looking into whether race played a role in her white co-worker's out-of-bounds remarks, all three brushed off Shorter. Not even the most superficial of inquiries or investigations was initiated.

106. No Truist Vice President, let alone any other Truist HR or other official, telephoned and questioned and hectored Shorter's white co-worker as Booysen had Shorter.

107. Shorter did not want her white co-worker hectored or harassed, but did want and expect her concerns about possible workplace racism to be taken seriously by her employer, but they were not.

108. Truist's giving short shrift to "training" regarding workplace discrimination, and its brushing off Shorter's concerns about racism in the workplace, attest to the company's deliberate indifference to workplace racism.

109. Truist's indifference to workplace racism was also on display when, instead of addressing Shorter's December 1, 2020, questions about Booysen's horrid treatment of her and its relationship to racism, Truist responded by firing Shorter and making the excuse / pretext that it was for an "ethics" violation that Shorter never committed.

**The State of Alabama Department of Labor's Findings**

110. In January 2021, Shorter applied for unemployment compensation benefits from the Alabama Department of Labor (ADOL).

111. Persons terminated from their work for misconduct are not eligible for unemployment compensation benefits.

112. Truist contested Shorter's application for unemployment compensation benefits, contending that she was fired for misconduct.

113. The ADOL conducted an investigation and in or around May 2021 determined that Shorter was, in fact, eligible for unemployment compensation benefits.

114. According to one ADOL official who contacted Shorter about her unemployment compensation application, and Truist's contest of same, a Truist official claimed Shorter was fired for "check kiting."

115. Shorter had not "kited checks."

116. In the end, in or around May 2021 the ADOL found Truist's contentions at the least unconvincing, at the most spurious.

<u>**COUNT I - Shorter**</u>
**Title VII – Truist's Discrimination Based on Race**

117. By this reference Plaintiff Shorter reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

118.  Plaintiff Shorter's race, Black, was at the least a motivating factor in Truist's Booysen's harassment of her, by and through its agent, Vice President Booysen.

119. When Shorter actually confronted Booysen and Truist with the question of whether race was a motivating factor for his harassing her, Truist's sole response was to fire Shorter.

120.  Both Booysen's harassing Shorter and Truist's firing her were adverse employment actions.

121. Truist's treatment of Shorter, by and through its agent's, Booysen's bullying, hectoring, oppressive, privacy-invading interrogation and refusal to even tell Shorter what she was accused of having done wrong (indeed, gaslighting Shorter), ignoring Shorter's questions regarding race discrimination, ignoring or otherwise brushing off her complaint submitted to Truist HR, went beyond mere mere workplace insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

122. Truist's treatment of Shorter was consistent with its giving short shrift to workplace discrimination training and June 2020 management brush-off of Shorter's concerns expressed regarding workplace race discrimination.

123. By and through its treatment of Shorter from November 19, 2020, leading up to its firing her, Truist proximately caused Shorter to suffer damages, including by not limited to, emotional distress, anxiety, mental anguish, and physical exhaustion, all

contributing to and accompanied by a Multiple Sclerosis flare-up, and other damages.

124.  Under Title VII Truist is liable to Shorter for said damages.

## COUNT II - Shorter

## Title VII – Truist's Retaliation for Participation in a Protected Act

125.  By this reference Plaintiff Shorter reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

126.  Plaintiff participated in an protected act as defined by Title VII and case law, to wit:  on December 1, 2020, reporting and/or questioning the degree to which Truist Vice President Brent Booysen's harassment was based on race.

127.  Also on or about December 1, 2020, Shorter called Truist's "Human Resources Hotline" and submitted a complaint about Booysen, including her concerns about race discrimination, which was a protected activity.

128. But Truist, Booysen, and Truist's HR ignored Shorter's complaint, then Truist fired Shorter.

129. Truist retaliated against Shorter by firing her in the wake of her reporting, questioning, Booysen's acts and omissions in the context of race and reporting, complaining about Booysen in the context of race discrimination, to Truist's HR. Truist's retaliation was temporally proximate to Shorter's protected act/s.

130. Truist's actions were such that they would likely dissuade or deter a

23

reasonable employee from exercising her or his legal rights under Title VII.

131. Truist willfully and intentionally violated Title VII by retaliating against Shorter, proximately causing harm and damages, including, but not limited to, loss of income, benefits, stress, mental anguish, anxiety, other damages.

132. Under Title VII Truist is liable to Shorter for said damages.

## COUNT III – Shorter
## 42 U.S.C. § 1981 – Race Discrimination in Employment

133. By this reference Plaintiff Shorter reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

134. 42 U.S.C. § 1981 prohibits workplace discrimination and/or an employer's adverse treatment of an employee based on race.

135. But for Shorter's race, Black, Truist would not have backed-up Booysen's deplorable treatment of Shorter, Truist would not have ignored her reporting, questioning, complaining about the racial aspects of Booysen's harassment, and Truist would not have fired Shorter in the wake of her complaints.

136. Truist willfully and intentionally violated 42 U.S.C. § 1981 in its disparate treatment of Plaintiff Shorter, proximately causing harm and damages, including, but not limited to, loss of income, benefits, stress, mental anguish, anxiety, other damages.

137. Under 42 U.S.C. § 1981 Truist is liable to Shorter for said damages.

## COUNT IV – Shorter

### Truist's Intentional Infliction of Emotional Distress

138.  By this reference Plaintiff Shorter reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein.

139.  Truist's acts perpetrated through its agent, Vice President Booysen, were intentional or reckless; were extreme and outrageous; were the proximate cause of Shorter's emotional distress, and physical injury in the form of a side-numbing MS flare-up; and resulted in emotional distress or accompanying bodily harm so severe that no reasonable person could be expected to endure it.

140. While Truist may believe a civilized society should tolerate actions such as Booysen's and the harm caused thereby, a civilized society and a reasonable juror would disagree with Truist.

141. While Truist may believe a civilized society should tolerate actions such as Booysen's that include race-based retaliation by Truist, and the harm caused thereby, a civilized society and a reasonable person would disagree with Truist.

142. Under Alabama common law, Shorter is entitled to recover damages from Truist for its intentional infliction of emotional distress perpetrated against her.

## COUNT V – Shorter

### Booysen's Intentional Infliction of Emotional Distress

143.  By this reference Plaintiff Shorter reiterates and incorporates the allegations

set forth in the preceding paragraphs as if fully set out herein.

144. Booysen's aforementioned acts and omissions were intentional or reckless; were extreme and outrageous; were the proximate cause of Shorter's emotional distress, and physical injury in the form of a side-numbing MS flare-up; and resulted in emotional distress or accompanying bodily harm so severe that no reasonable person could be expected to endure it.

145. While Booysen may believe a civilized society should tolerate actions such as his and the harm caused thereby, a civilized society and a reasonable juror would disagree with Booysen.

146. While Booysen may believe a civilized society should tolerate actions such as Booysen's that the role he played in Truist's race-based retaliation, and the harm caused thereby, a civilized society and a reasonable person would disagree with Truist.

147. Under Alabama common law's prohibition on intentional infliction of emotional distress, Booysen is liable to Shorter for the aforementioned damages.

## COUNT VI – Shorter
### 42 U.S.C. § 1981 –  Race Discrimination Re:  Checking Account

148.  By this reference Plaintiff Shorter reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein, in passim; see especially Paragraphs 85 – 93.

149. 42 U.S.C. § 1981 prohibits race discrimination in contracting.

150. But for Shorter's race, Black, Truist would not closed her and her son's, Chad Slade's joint checking account, specifically in the wake of Shorter reporting her concerns about race discrimination to both Booysen and to Truist's HR department.

151. The State of Alabama Department of Labor determined Shorter had not committed any misconduct. All that's left was her race, along with her raising questions to Truist about the relationship between her race and Booysen's actions.

152. When Truist closed the joint checking account, Shorter not only suffered various, banking hassles, but also suffered humiliation, degradation and stress which Truist proximately caused by its acts and omissions.

153. Under 42 U.S.C. § 1981 Truist is liable to Shorter for said damages.

## **COUNT VII – Slade**
### **42 U.S.C. § 1981 –  Race Discrimination Re:  Checking Account**

154.  By this reference Plaintiff Shorter reiterates and incorporates the allegations set forth in the preceding paragraphs as if fully set out herein, in passim; see especially Paragraphs 85 – 93.

155. 42 U.S.C. § 1981 prohibits race discrimination in contracting.

156. But for Slade's and his mother's, Shorter's race, Black, Truist would not closed his and his mother's joint checking account, specifically in the wake of Shorter

reporting her concerns about race discrimination to both Booysen and to Truist's HR department.

157. The State of Alabama Department of Labor determined Shorter had not committed any misconduct. All that's left was her – and Slade's – race, along with Shorter having raised questions to Truist about the relationship between her race and Booysen's actions.

152. When Truist closed the joint checking account, Slade not only suffered various, banking hassles, but also suffered humiliation, degradation and stress which Truist proximately caused by its acts and omissions.

153. Under 42 U.S.C. § 1981 Truist is liable to Slade for said damages.

## REQUEST FOR RELIEF

**A.** NOW, WHEREFORE, regarding Counts I through IV above, Shorter respectfully requests the following relief after trial of this case by struck jury:

[i].   Entry of judgment in her favor and against Truist for compensatory damages including for lost income, benefits, stress, frustration, pain, and mental anguish proximately caused by Truist's acts and omissions.

[ii].   Entry of judgment in her favor and against Truist for punitive damages damages.

[iii].   Injunctive relief in the form of an Order requiring Truist to (i) re-visit and

update its discrimination policies, practices, training, and, (ii) retrain Truist's directors, officers, Human Resources personnel and all employees and staff regarding Title VII and Section 1981 and related employment discrimination laws.

[iv].  Reasonable attorney's costs and fees (less and except Count IV).

**B.**  Regarding regarding Count V above, Shorter respectfully requests the following relief after trial of this case by struck jury:

[i].  Entry of judgment in her favor and against Booysen for compensatory damages including for stress, frustration, pain, and mental anguish proximately caused by Truist's acts and omissions.

[ii].  Entry of judgment in her favor and against Booysen for punitive damages.

**C.**  Regarding regarding Count VI above, Shorter respectfully requests the following relief after trial of this case by struck jury:

[i].  Entry of judgment in her favor and against Truist for compensatory damages including for stress, frustration, pain, and mental anguish proximately caused by Truist's acts and omissions.

[ii].  Entry of judgment in her favor and against Truist for punitive damages.

[iii].  Reasonable attorney's costs and fees.

29

**D.** Regarding regarding Count VII above, Slade respectfully requests the following relief after trial of this case by struck jury:

[i].  Entry of judgment in his favor and against Truist for compensatory damages including for stress, frustration and mental anguish proximately caused by Truist's acts and omissions.

[ii].  Entry of judgment in her favor and against Truist for punitive damages damages.

[iii].  Reasonable attorney's costs and fees.

Plaintiffs respectfully request any additional relief in law or equity which the Court may see fit to grant.

Respectfully filed on this, the 4th day of January, 2022.

Richard R. Newton,
  Attorney at Law, P.C.
Counsel for Plaintiffs Shorter and Slade
1203 Regal Avenue
Birmingham, AL  35213
Tel:  (205) 356-2498
richardrussellnewton@gmail.com
ASB-0776-w85r

**Served on:**

**An Officer or Agent of Truist Financial Corporation**

Truist Financial Corporation
Truist Center
214 North Tryon Street
Charlotte, North Carolina  28202

**Personal service on:**

Brent Booysen
110 S. Stratford Road
Winston-Salem, NC  27104

EEOC Form 161-B (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: **Gramata Shorter** | From: | **Birmingham District Office** |
|---|---|---|
| **Moody, AL** ▮▮▮ | | **Ridge Park Place** |
| | | **1130 22nd Street South** |
| | | **Birmingham, AL 35205** |

☐    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | **KEISHA JACKSON,** | |
| **420-2021-00808** | **Investigator** | **(205) 651-7063** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☒    More than 180 days have passed since the filing of this charge.

☐    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒    The EEOC is terminating its processing of this charge.

☐    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐    The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐    The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

SHERI GUENSTER    Digitally signed by SHERI GUENSTER
Date: 2021.10.18 08:50:57 -05'00'

Enclosures(s)

*/for* **BRADLEY A. ANDERSON,**
**District Director**

*(Date Issued)*

| cc: | **BB&T / TRUIST BANK** | | **Richard R. Newton** |
|---|---|---|---|
| | **c/o Christina Bailey** | | **Richard R Newton Attorney At Law, P.C.** |